[Cite as *In re J.H.*, 2017-Ohio-7070.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 105078**

# IN RE: J.H.
# Minor Child

## [Appeal By L.H., Father]

## JUDGMENT:
AFFIRMED

Civil Appeal from the
Cuyahoga County Court of Common Pleas
Juvenile Division
Case No. AD 14911147

**BEFORE:** E.A. Gallagher, P.J., Boyle, J., and Laster Mays, J.

**RELEASED AND JOURNALIZED:** August 3, 2017

**ATTORNEY FOR APPELLANT**

Judith M. Kowalski
333 Babbitt Road, Suite 323
Euclid, Ohio 44123


**ATTORNEYS FOR APPELLEE**

Michael C. O'Malley
Cuyahoga County Prosecutor
By: Joseph C. Young
Assistant Prosecuting Attorney
Cuyahoga County Division of Children and Family Services
3955 Euclid Avenue
Cleveland, Ohio   44115

**MOTHER**

L.W., pro se
2496 Morris Black Place, Apt. F
Cleveland, Ohio 44104

**GUARDIAN AD LITEM FOR J.H.**

Cynthia M. Morgan
2968 Meadowbrook Blvd.
Cleveland Heights, Ohio 44118

EILEEN A. GALLAGHER, P.J.:

{¶1} Defendant-appellant L.H. ("the father") appeals from the decision of the Juvenile Division of the Cuyahoga County Court of Common Pleas (the "juvenile court") granting permanent custody of his son, J.H., to the Cuyahoga County Department of Children and Family Services ("CCDCFS" or "the agency"). For the following reasons, we affirm the judgment of the juvenile court.

**Factual and Procedural Background**

{¶2} J.H. was born on August 24, 2014. Five days later, CCDCFS filed a complaint for dependency and temporary custody. The complaint alleged that J.H. was dependent because the child's mother, L.W. ("the mother"), had a substance abuse problem and an untreated mental health condition, was homeless and had six other children who were not in her care due to her substance abuse. The complaint further alleged that the father had failed to establish paternity and had failed to support, visit or communicate with J.H. since his birth. CCDCFS requested that J.H. be placed in the temporary custody of his maternal grandmother and also filed a motion for predispositional temporary custody, requesting that J.H.'s maternal grandmother be granted predispositional temporary custody of J.H.

{¶3} An emergency custody hearing was held on September 19, 2014. The juvenile court granted CCDCFS' motion for predispositional temporary custody and appointed J.H.'s maternal grandmother as his temporary custodian. On September 30, 2014, CCDCFS filed a case plan that required the mother to complete a drug and alcohol

assessment and psychological evaluation, successfully complete any recommended drug and alcohol treatment and aftercare, undergo random drug screens, engage in any recommended mental health services and submit her DNA for paternity testing. The case plan required the father to establish paternity.

{¶4} At the adjudicatory hearing on November 4, 2014, the mother and father stipulated to the allegations of an amended complaint[1] and J.H. was adjudicated to be dependent. On November 7, 2014, the father filed a motion for legal custody of J.H. The father asserted that he was "ready, willing, and able to take legal custody" of J.H., that he had resolved the concerns alleged by CCDCFS in the complaint, that he was in the process of establishing paternity and was an appropriate caregiver who could meet J.H.'s basic needs.

---

[1]Specifically, the father and the mother stipulated:

1. Mother has a history of substance abuse and is currently enrolled in substance abuse treatment. Mother has previously been referred for multiple drug treatment programs.

2. Mother is diagnosed with depression and is in need of ongoing mental health services in order to provide adequate care for the child.

* * *

4. Mother has six other children that are not in her care due to her substance abuse. Three of the children are in the care of the maternal grandmother. One child is in the legal custody of a family friend. CCDCFS obtained permanent custody of two other children. * * *

5. Alleged father * * * is in the process of establishing paternity. Alleged father has visited the child. * * *

{¶5} A dispositional hearing was held on January 16, 2015. On January 20, 2015, CCDCFS filed an amended case plan based on the parents' completion of paternity testing, which established that L.H. was the father of J.H. No additional requirements or services were added to the case plan. On February 9, 2015, the court approved the case plan and J.H. was committed to the temporary custody of his maternal grandmother.

{¶6} On July 21, 2015, CCDCFS filed a motion to extend temporary custody six months until February 29, 2016. CCDCFS also requested that the court issue findings of facts that continued placement was in the best interest of J.H. and that CCDCFS had made reasonable efforts to finalize a permanency plan for J.H. The agency acknowledged that progress had been made on the case plan since the order granting temporary custody but indicated that because all of the case plan objectives had not yet been completed, the risk to J.H. had not been sufficiently reduced. The agency asserted that it would seek to reunify J.H. with his mother following the six-month extension if she achieved the remaining objectives of the case plan; otherwise, it would pursue a new, permanent home for the child.

{¶7} At the September 22, 2015 hearing on the motion to extend temporary custody, after discussing the mother's level of engagement with case plan services, the magistrate raised the issue of what was being done with respect to the father. The CCDCFS social worker then assigned to the case indicated that the father had "complete[d] a drug screen when asked" and that it was negative "[s]o we had no reason

to ask him again." The magistrate further inquired about the agent's efforts to reunify J.H. with his father as follows:

> THE COURT: So what are we doing about why the child's not with the father?
>
> [CCDCFS SOCIAL WORKER]: We've discussed that.
>
> THE COURT: If he has nothing else on his case plan to do.
>
> [CCDCFS SOCIAL WORKER]: Right. We've discussed that in an SAR and the reason being is that dad and mom live together and dad works second shift.
>
> THE COURT: Okay.
>
> [CCDCFS SOCIAL WORKER]: And there [were] no arrangements for child care.
>
> THE COURT: Okay.

{¶8} Prior to the hearing, the GAL submitted a report in which she indicated that J.H. was "successfully residing with his maternal grandmother," was being "well cared for" and was seeing his parents regularly while in placement. She recommended that temporary custody be continued because "neither parent has sufficiently participated with case plan services to be able to appropriately parent their toddler son." She made a similar recommendation at the hearing to "giv[e] mom more time." The parents agreed to the extension of temporary custody and the juvenile court granted the motion. The court indicated that although "[t]here has been significant progress on the case plan by the mother and by the father and progress has been made in alleviating the cause for the removal of the child from the home," extension of temporary custody was "necessary and

in the child's best interest." The juvenile court further found that the agency had made reasonable efforts to finalize the permanency plan of reunification for J.H. by offering drug treatment and mental health services.

{¶9} On February 5, 2016, CCDCFS filed a motion to modify the order granting temporary custody to the maternal grandmother to an order granting permanent custody of J.H. to CCDCFS ("motion for permanent custody"). As grounds for its motion, the agency asserted that J.H. could not or should not be placed with either parent within a reasonable time, citing R.C. 2151.414(B)(1)(a) and R.C. 2151.414(E), and that permanent custody was in the best interest of J.H. under R.C. 2151.414(D)(1). In support of the motion, the agency submitted an affidavit from CCDCFS social worker, Barbara Solomon, in which she stated that the mother had failed to complete substance abuse treatment, had failed to consistently provide drug screens and that her parental rights had been terminated as to six other children. With respect to the father, Solomon indicated that he had established paternity and completed drug screening, but did not have "separate, suitable housing to provide for the care of the child." An evidentiary hearing on the motion was scheduled for June 6, 2016.

{¶10} On March 28, 2016, the GAL submitted an updated report reflecting a recent visit she had had with the father in which he advised her that he "intends to find housing with his aunt" and no longer reside with the mother. In her report, the GAL indicated that the father was employed, had provided negative urine screens consistently, had no need for substance abuse treatment or psychological services and had established

paternity. The GAL further indicated that both parents "attend consistent visitation with their son * * * minimally every other week" at the residence of his daycare provider "so bonding and attachment to parents is continuing." Based on these facts, the GAL recommended that J.H. "continue in Temporary Custody, pending the filing of [an] Amended Motion to Modify Temporary Custody to Maternal Grandmother to a Motion for Permanent Custody to CCDCFS, or in the alternative [an] Amended Motion to Modify Temporary Custody to Legal Custody to Father if [a] new residence not located with the mother is able to take place, as father will have met all of his case plan requirements and this will be in the best interests of my ward."

{¶11} On May 27, 2016, the father filed a second motion for legal custody and CCDCFS moved for a continuance of the June 6, 2016 hearing on the ground that both the social worker who had been assigned to the case and her supervisor were no longer employed by CCDCFS. The juvenile court granted the motion for continuance and the hearing was continued to August 17, 2016.

{¶12} Before the hearing commenced, CCDCFS advised the court that it (1) had recently learned that the father was allegedly no longer residing with the mother and had moved in with the paternal grandmother and (2) had received a report from the mother that the father had assaulted her. The agency requested a continuance to complete a home visit of the father's new residence and to investigate the mother's domestic violence allegations. The GAL joined in the agency's motion for a continuance. The father indicated that he had no objection to a continuance and the mother offered "no opinion"

as to the request for continuance. The juvenile court denied the motion and proceeded with the hearing on CCDCFS' motion for permanent custody and the father's motion for legal custody.

**Testimony by social workers**

{¶13} At the hearing, CCDCFS presented testimony from two of the three social workers who had worked on the case — Barbara Solomon, the social worker who had been assigned to the case from January 2016 until May 2016, and Shauntaya Howard, the social worker assigned to the case beginning on May 27, 2016.

{¶14} The social workers established that four of the mother's seven children, including J.H., resided with the maternal grandmother and that CCDCFS had been awarded permanent custody of two of those children in 2010 and 2013. The social workers further established that the mother had been diagnosed with a major depressive disorder and cannabis dependency and that the mother's case plan required her to engage in mental health and substance abuse treatment and services. Solomon testified that, initially, the mother received mental health and substance abuse services through the Women's Recovery Center but was released in March 2015 for noncompliance with treatment requirements. Solomon stated that the mother then enrolled in another substance abuse treatment and mental health program at Connections and completed an intensive outpatient program in December 2015. Solomon testified that when she took over the case in January 2016, the mother was doing well with the program but that her attendance then began "falling off."

**{¶15}** Howard offered similar testimony. She testified that the records received from Connections indicated that the mother's compliance with required case plan services was "kind of sporadic" and showed that, in 2016, the mother had failed to attend numerous scheduled substance abuse sessions and psychotherapy appointments.

**{¶16}** The social workers testified that the mother was also inconsistent in providing requested drug screens. Solomon tested that the mother's drug screens in May and June 2015 were positive for marijuana and that a September 2015 drug screen was positive for PCP. Although the mother's urine screens in February and March 2016 were negative, Howard testified that the mother failed to appear for a urine screen in July 2016 and repeatedly refused to provide hair samples for drug testing. The results of a urine screen the mother provided in August 2016 were pending at the time of the hearing.

**{¶17}** With respect to the father, the social workers testified that J.H. was the father's only child and that the father had promptly established paternity of J.H. as required under the case plan. The social workers indicated that the father was employed, had no criminal record and no substance abuse or mental health issues but that he had never established stable housing. As such, Solomon stated that she did not believe the father could meet J.H.'s basic needs. Howard indicated that "other investigations" would need to be done before the father could be considered a suitable caregiver for J.H.

**{¶18}** Solomon testified that shortly after she took over the case in February 2016, she asked the father whether he would be interested in gaining custody of J.H. She

indicated that he responded, "absolutely not" because "he didn't want to break his family apart and * * * take his son away from his mother."

{¶19} Two months later, after the mother's progress with the case plan declined, Solomon and the father spoke again. Solomon testified that the father told her that he had changed his mind and wanted custody of J.H. According to Solomon, the father told her that he knew the mother was not engaged in her case plan services, that he was planning on leaving the mother and moving in with an aunt who would allow him and J.H. to live with her and that he wanted to gain custody of J.H. because J.H. was his only son. Solomon testified that she asked the father to undergo another urine screen, to submit a hair sample for drug testing and to provide the aunt's name and address so she could schedule a home visit and determine whether the aunt's home would be appropriate. Solomon stated that the father completed the urine screen, which was negative. However, he refused to submit the hair sample and never provided the aunt's contact information. Solomon testified that she called the father "maybe a couple weeks later" in an attempt to follow up but was unable to reach him.

{¶20} Howard testified that she first spoke with the father approximately a week before the hearing, after she realized that he had filed a motion for legal custody. Howard testified that she had not attempted to contact the father sooner because, in speaking with the prior social workers who had handled the case, the father was not considered to be a suitable caregiver for J.H. She indicated that the father was not considered to be a suitable caregiver because he was still in a relationship with the mother

and was unwilling to leave her and the mother's continued substance abuse and failure to comply with mental health services was "a barrier" in the case.

{¶21} Howard indicated that when she spoke with the father a week before the hearing, he informed her that he was now living with his mother, J.H.'s paternal grandmother, and that he had filed the motion for legal custody because "he wants his son." Howard testified that they discussed the father's relationship with the mother and that the father said "he understands that now he needs to stay away from mom." When asked about the mother's recent domestic violence allegations, the father denied them, claiming that he just "took her some food because she was hungry." Howard and the father also discussed his job and income. According to the father, he had been employed at the same company for three years and was able to provide for J.H. Howard told the father that before he could be considered for custody, he would need to submit to a urine screen and provide a hair sample for drug testing and the agency would need to conduct a home visit. Howard testified that she did not independently verify the father's employment or income at that time but that she expected to see a paystub or other documentation of his employment and income during the home visit.

{¶22} According to Howard, the father said he would appear for a urine screen and provide a hair sample the next day, but failed to do so. Howard testified that they also made arrangements for Howard to conduct a home visit the following Monday. Howard testified that, on Monday morning, she appeared at the address she was given and knocked on the door but no one answered. Howard stated that she did not immediately

contact the father regarding the missed appointment because she did not have his number with her. Instead, when Howard returned to the office, she spoke with her supervisor. According to Howard, once she determined that the father had not completed the urine screen, her supervisor told her to "hold off" on any further communications with the father due to the upcoming permanent custody hearing.

{¶23} With respect to the father's relationship with J.H., Solomon testified that she did not know whether there was a bond between the father and J.H. because she had never the seen the father interact with J.H. Solomon testified that the father was not present during her monthly home visits with the maternal grandmother or when she visited J.H. at the daycare facility he attended. Solomon indicated that the maternal grandmother told her that she took J.H. to visit the mother about once a month and that, according to the maternal grandmother, the father was present for some of these visits, but that she had no information regarding how often the father was there.

{¶24} Howard testified that she was aware that the father saw J.H. when J.H. visited with his paternal grandmother but that she had never personally observed the father interact with J.H. The social workers testified that J.H. visited his paternal grandmother on a regular basis and that she and the maternal grandmother had a "good relationship." Solomon testified that she had asked for the paternal grandmother's contact information but was informed that the paternal grandmother did not want to get involved. There were no reports of any harm to J.H. while he was in the care of his paternal grandmother.

**{¶25}** With respect to permanency plan for J.H., the social workers stated that the maternal grandmother had informed them that she wanted to adopt J.H. and was willing to maintain "connections with [his] paternal grandmother and dad and different things of that nature" if the agency were to be granted permanent custody of J.H.

**Recommendations of GAL**

**{¶26}** The juvenile court also considered the recommendations of the GAL. On the date of the hearing, the GAL filed an updated report in which she recommended that the maternal grandmother be granted legal custody of J.H. or, alternatively, that permanent custody be granted to CCDCFS and J.H. placed with his maternal grandmother. Specifically, with respect to the father, the GAL indicated in her report:

> GAL attempted to spend time at residence of Mr. Harris, who was going to be housed with his aunt, who owns her residence. Father, however, continues to resides [sic] with mother * * *. Father is employed part-time, has provided negative urine screens consistently, has had no treatment ordered through CCDCFS, has no need of psychological services, has established paternity. [Father] has no criminal background and no family history of mental illness. Father inconsistently visits with his son[.]

**{¶27}** The GAL further noted that J.H. was "successfully residing" with his material grandmother, "on target physically" and "being well cared for in placement." Whereas in prior reports, the GAL had indicated that parents regularly visited with J.H. and acknowledged continuing bonding and attachment between J.H. and his parents, the GAL now indicated that J.H. "sees his parents irregularly while at placement, so bonding and attachment to parents is tenuous."

**{¶28}** The GAL also made a statement at the hearing and was cross-examined by counsel for the father.

**{¶29}** At the hearing, the GAL stated that it was "with deep regret" that she was not recommending that legal custody be awarded to the father. She noted that the father

was employed with income ranging between $700 and $1000 per month and that he had complied with the agency's requests for random urine screens — all of which were negative. She indicated, however, that, until recently, the father's position had been that he wanted J.H. to be reunited with the mother — i.e., saying to the GAL, "I want mom to get better and then we're all going to be a family" — and that he had never demonstrated that he had secured suitable housing for himself and J.H. She acknowledged that there was a point at which she had recommended that legal custody be awarded to the father, but that given that J.H. had now been living with his maternal grandmother for nearly two years, "the dependency of the two is too much." She, therefore, recommended that permanent custody of J.H. be awarded to CCDCFS so that he could be adopted by his maternal grandmother.

{¶30} When asked whether she had any concerns regarding the father's ability to parent J.H., the GAL replied that she was not sure whether he had appropriate housing and that, although the father himself had never tested positive for substance abuse, the fact that he continued to remain with someone who was a drug abuser was, in her view, cause for concern. She also questioned whether a mental health assessment was warranted but acknowledged that she had never requested that such an assessment be included as part of the father's case plan. The GAL stated that she had last spoken with the father in April 2016 and had not attempted to contact the father since that time. She had not received any information indicating that the father had moved from the mother's home and now resided with his mother, but indicated that the father had had two years to

"remove himself [from the mother] and do all the things that the Agency was asking him to do" and that given that J.H. had spent the past two years living with his half-siblings in a stable environment, "it's just too little too late.'"

**{¶31}** Neither the mother nor the father testified or offered any witnesses or other evidence at the hearing. However, the mother advised the court that she was "not in favor of legal custody to the father."

**Ruling on motion for permanent custody**

**{¶32}** On September 21, 2016, the juvenile court denied the father's motion for legal custody and granted the agency's motion for permanent custody, terminating the parental rights of both parents and awarding permanent custody of J.H. to CCDCFS. The juvenile court found "by clear and convincing evidence" that J.H. had been removed from the mother's custody on September 23, 2014 and had been out of the parents' custody continuously since that time, that J.H. could not be placed with the parents within a reasonable time or should not be placed with the parents and that it was in J.H.'s best interest to grant permanent custody to the agency. Specifically, with respect to the father, the juvenile court found:

> The father has not remedied the conditions causing removal.
>
> The current social worker made an appointment to see where the father lives, but when she showed up, no one answered the door. The father made no effort to contact the current social worker. The father was asked to provide a urine screen and a hair sample for drug testing on the Thursday before the trial date and he failed to show up for this testing.
>
> The father has moved in with his mother, the child's paternal grandmother. In order for the child to be reunified with the father, the paternal

grandmother would have to be fingerprinted. The paternal grandmother had no contact with the former social worker, Ms. Solomon, because she did not want to be formally involved.

Ms. Solomon testified that when she talked to the father in February 2016, he did not want custody. He wanted the mother to have custody. In April 2016, 18 months after the child was removed and with the permanent custody [motion] pending, the father said he did want custody and that he was moving in with an aunt. The social worker asked for the aunt's address but the father never gave it to her.

Ms. Solomon tried to contact the father with no success and he made no other efforts to contact her. The father refused to provide a hair sample in April 2016 when she requested it. The father cannot meet the basic needs of the child. His employment has never been verified and he has had no independent housing over the course of this case.

{¶33} The juvenile court further found that CCDCFS had made reasonable efforts to prevent placement and/or to make it possible for the child to remain in or return to the home and to finalize the permanency plan for the child with a permanency goal of adoption.

{¶34} The father appealed,[2] raising the following four assignments of error for review:

First Assignment of Error: The juvenile court abused its discretion in determining that clear and convincing evidence supported its decision to award permanent custody to the Cuyahoga County Department of Children and Family Services.

---

[2] The mother also appealed the juvenile court's award of permanent custody to CCDCFS. In *In re J.H.*, 8th Dist. Cuyahoga No. 105055, 2017-Ohio-940, this court dismissed the mother's appeal pursuant to *Anders v. California*, 386 U.S. 738, 87 S.Ct. 1396, 18 L.E.2d 493 (1967), and Loc.App.R. 16(C), concluding that there was no merit to the appeal and that "[t]he record as a whole clearly and convincingly demonstrates that J.H. cannot be placed with either parent, and it is in the best interest of J.H. to grant permanent custody to the agency."

Second Assignment of Error: The decision to award permanent custody was against the manifest weight of the evidence.

Third Assignment of Error: The trial court abused its discretion in finding the award of permanent custody was in the best interests of the child.

Fourth Assignment of Error: When the trial court is required to make a determination that a public service agency made reasonable efforts to reunify children with their family, the trial court erred by ruling in favor of permanent custody when the record shows a failure to provide diligent case planning.

{¶35} The father's assignments of error are interrelated and will be addressed together where appropriate.

**Law and Analysis**

{¶36} A parent has a "'fundamental liberty interest' in the care, custody and management" of his or her child, *In re Murray*, 52 Ohio St.3d 155, 156, 556 N.E.2d 1169 (1990), quoting *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982), and the right to raise one's own child is "'an essential and basic civil right,'" *In re N.B.*, 8th Dist. Cuyahoga No. 101390, 2015-Ohio-314, ¶ 67, quoting *In re Hayes*, 79 Ohio St.3d 46, 48, 679 N.E.2d 680 (1997). However, this right is not absolute. It is "'always subject to the ultimate welfare of the child, which is the polestar or controlling principle to be observed.'" *In re L.D.*, 8th Dist. Cuyahoga No. 104325, 2017-Ohio-1037, ¶ 29, quoting *In re Cunningham*, 59 Ohio St.2d 100, 106, 391 N.E.2d 1034 (1979).

**{¶37}** Because termination of parental rights is "'the family law equivalent of the death penalty in a criminal case,'" *In re J.B.*, 8th Dist. Cuyahoga No. 98546, 2013-Ohio-1704, ¶ 66, quoting *In re Hoffman*, 97 Ohio St.3d 92, 2002-Ohio-5368, 776 N.E.2d 485, ¶ 14, it is "an alternative [of] last resort." *In re Gill*, 8th Dist. Cuyahoga No. 79640, 2002-Ohio-3242, ¶ 21. It is, however, "sanctioned when necessary for the welfare of a child." *In re M.S.*, 8th Dist. Cuyahoga Nos. 101693 and 101694, 2015-Ohio-1028, ¶ 7, citing *In re Wise,* 96 Ohio App.3d 619, 624, 645 N.E.2d 812 (9th Dist.1994). All children have "'the right, if possible, to parenting from either natural or adoptive parents which provides support, care, discipline, protection and motivation.'" *In re J.B.* at ¶ 66, quoting *In re Hitchcock*, 120 Ohio App.3d 88, 102, 696 N.E.2d 1090 (8th Dist.1996). Where parental rights are terminated, the goal is to create "a more stable life" for dependent children and to "facilitate adoption to foster permanency for children." *In re N.B.* at ¶ 67, citing *In re Howard*, 5th Dist. Tuscarawas No. 85 A10-077, 1986 Ohio App. LEXIS 7860, *5 (Aug. 1, 1986).

**Standard for terminating parental rights and awarding permanent custody to CCDCFS**

**{¶38}** Before a juvenile court can terminate parental rights and grant permanent custody of a child to CCDCFS, it must apply the two-prong test set forth in R.C. 2151.414. First, the juvenile court must find by clear and convincing evidence that one of the conditions set forth in R.C. 2151.414(B)(1)(a) through (e) exists:

> (a) The child is not abandoned or orphaned, has not been in the temporary custody of one or more public children services agencies or private child

placing agencies for twelve or more months of a consecutive twenty-two-month period, or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period if, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.

(b) The child is abandoned.

(c) The child is orphaned, and there are no relatives of the child who are able to take permanent custody.

(d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state.

(e)  The child or another child in the custody of the parent or parents from whose custody the child has been removed has been adjudicated an abused, neglected, or dependent child on three separate occasions by any court in this state or another state.

**{¶39}** Second, the juvenile court must find by clear and convincing evidence that granting permanent custody to the agency is in the best interest of the child.  R.C. 2151.414(B)(1).  In this case, the record reflects that both prongs of the test have been satisfied.

**Determination that J.H. could not be placed with the father  within a reasonable time or should not be placed with him**

**{¶40}** In his first and second assignments of error, the father argues that the juvenile court's determination under R.C. 2151.414(B)(1)(a) and (E) that J.H. could not be placed with the father within a reasonable time or should not be placed with him is not supported by clear and convincing evidence and is against the manifest weight of the evidence.[3]

**{¶41}** "Clear and convincing evidence" is that measure or degree of proof that is more than a "preponderance of the evidence," but does not rise to the level of certainty required by the "beyond a reasonable doubt" standard in criminal cases. *In re M.S.*, 2015-Ohio-1028, at ¶ 8. It "produces in the mind of the trier of fact a firm belief or conviction as to the facts sought to be established." *Id.*

---

[3] The juvenile court also explicitly found that J.H. "was removed from the mother's custody on September 23, 2014 and has been out of the custody of the parents continuously since then." The record reflects that temporary custody was awarded to the maternal grandmother on September 23, 2014, and that she maintained temporary custody of J.H. continuously through the hearing date. CCDCFS asserts that "[t]his set of facts alone is sufficient to satisfy the first prong of the permanent custody statute" under R.C. 2151.414(B)(1)(d), "leaving only the best interest finding to be decided." However, a review of CCDCFS' permanent custody motion shows that CCDCFS did not move for permanent custody based on R.C. 2151.414(B)(1)(d). With respect to the first prong of the permanent custody test, it asserted only that "the condition listed at R.C. 2151.414(B)(1)(a) exists and that one or more of the factors listed in R.C. 2151.414(E) apply to the parent of the child at issue." Because the evidence supports the juvenile court's determination under R.C. 2151.414(B)(1)(a), we need not decide, under the facts and circumstances here, whether the juvenile court could have also properly granted permanent custody to CCDCFS based on R.C. 2151.414(B)(1)(d). *See, e.g., In re B.P.*, 3d Dist. Marion No. 9-16-57, 2017-Ohio-2919, ¶ 16 ("'[t]he factors contained within R.C. 2151.414(B)(1)(a)-(e) are alternative findings, and only one must be met in order for the first prong of the permanent custody test to be satisfied"), quoting *In re S.G.*, 9th Dist. Wayne No. 15AP0005, 2015-Ohio-2306, ¶ 11.

**{¶42}** In determining whether a juvenile court based its decision on clear and convincing evidence, a reviewing court will examine the record to determine whether the trier of fact had sufficient evidence before it to satisfy the degree of proof. *In re T.S.*, 8th Dist. Cuyahoga No. 92816, 2009-Ohio-5496, ¶ 24, citing *State v. Schiebel*, 55 Ohio St.3d 71, 74, 564 N.E.2d 54 (1990). A juvenile court's decision to grant permanent custody will not be reversed as being against the manifest weight of the evidence "if the record contains some competent, credible evidence from which the court could have found that the essential statutory elements for permanent custody had been established by clear and convincing evidence." *In re A.P.*, 8th Dist. Cuyahoga No. 104130, 2016-Ohio-5849, ¶ 16.

**{¶43}** R.C. 2151.414(E) lists factors for determining whether a child cannot be placed with either parent within a reasonable period of time or should not be placed with his or her parents. If the court determines, by clear and convincing evidence, that one or more of the factors listed exist as to each of the child's parents, R.C. 2151.414(E) directs that "the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent."

**{¶44}** In this case, as it relates to the father, the juvenile court found that the factors set forth in R.C. 2151.414(E)(1) and (4) applied. As the juvenile court explained:

> Pursuant to R.C. 2151.414(E), the Court finds the child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents because one or more of the following exist:

(1)  Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parents have failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the home.

(4)  The parents have shown a lack of commitment toward the child.

**{¶45}** The father contends that these findings under were not supported by clear and convincing evidence because (1) the father is employed, has housing and completed the only requirement in his case plan by establishing paternity, (2) all of the father's requested drug screens were negative, (3) the agency and the GAL "did almost no investigation of the father," including failing to verify his employment and waiting until "almost the 11th hour to schedule a home visit" and (4) the two social workers who testified observed no interaction between the father and J.H. and could not state whether he and J.H. were bonded.  He also contends that the juvenile court's permanent custody decision should be reversed on manifest weight grounds because the "credibility of the state's witnesses" was "at best questionable."  We disagree.

**{¶46}**  Simply because a parent complies with the requirements of his or her case plan does not mean that the parent has sufficiently remedied the conditions that caused the child to be removed from the parent's custody:

> "A parent can successfully complete  the terms of a case plan yet not substantially remedy the conditions that caused the children to be removed — the case plan is simply a means to a goal, but not the goal itself. Hence, the courts have held that the successful completion of case plan requirements does not preclude a grant of permanent custody to a social services agency."

*In re J.H.*, 8th Dist. Cuyahoga No. 105073, 2017-Ohio-1564, ¶ 41, quoting *In re C.C.*, 187 Ohio App.3d 365, 2010-Ohio-780, 932 N.E.2d 360, ¶ 25 (8th Dist.).

{¶47} As the social workers explained, this case was unique in that the father advised the agency early on that "he didn't want to break his family apart and * * * take his son away from his mother," i.e., that he did not want custody of his son separate and apart from the mother. The GAL offered similar testimony. Rather than independently seeking to establish himself as a suitable caregiver for J.H., the father chose — heedless of the consequences his decision would have on his child and his relationship with his child — to bind his fate with that of J.H.'s mother. It was, therefore, the mother's substance abuse and mental health issues — and not any issues independently involving the father — that presented the primary "barrier" that needed to be remedied before J.H. could be reunified with his parents. The father does not dispute that the mother failed to substantially remedy the substance abuse and mental health issues that caused J.H. to be removed from his parents' custody. The father lived with the mother and knew what she was doing and not doing, including that she was not complying with the requirements of the case plan.

{¶48} The record reflects that, once he established paternity, the father took no steps to pursue custody in his own right until the spring of 2016 — after J.H. had been living with his maternal grandmother and his two half-siblings for more than 18 months. In April 2016, the father advised the social worker that he was leaving the mother and wanted to gain custody of his child. However, he failed to take the steps necessary to

enable the agency and the GAL to investigate his circumstances and determine whether he would be an appropriate caregiver for J.H.

{¶49} The social workers testified that although the father provided urine screens in 2015 and 2016 that were negative, he refused to provide a hair sample for drug testing. Further, although the father indicated in April 2016 that he was living with an aunt, he never provided her name and address to the agency so that a home visit could be conducted. When shortly before the hearing on the motion for permanent custody, the father advised Howard that he had established a permanent residence with his mother, J.H.'s paternal grandmother, he once again failed to provide the information the agency requested so that it could determine whether J.H. could be properly placed with him. Although the agency did not give the father much lead time — both the updated drug testing and home visit were requested days before the hearing on the motion for permanent custody — there is nothing in the record to indicate that the father objected to the timing of these requests. To the contrary, Howard testified that the father had agreed to (1) provide a urine screen and hair sample for drug testing the Friday before the hearing and (2) be available for a home visit of the paternal grandmother's residence the Monday before the hearing. The father nevertheless inexplicably failed to comply with the agency's requests as agreed. When the agency and GAL requested a continuance of the hearing date to complete these tasks and further investigate the father as a suitable caregiver, the father did not join in the motion; he indicated only that he had no objection to a continuance.

**{¶50}** The father argues that the agency "tacitly acknowledged" that it lacked sufficient evidence to support its request for permanent custody when it moved for a continuance on the morning of the hearing. However, simply because the agency sought a continuance to investigate new information it had received regarding the father does not mean the evidence, as presented, did not clearly and convincingly support the juvenile court's findings. Following a thorough review of the record, we conclude that the juvenile court's determination that J.H. could not be returned to his father within a reasonable time or should not be returned to his father under R.C. 2151.414(B)(1)(a) and R.C. 2151.414(E) was supported by clear and convincing evidence and was not against the manifest weight of the evidence. The father's first and second assignments of error are overruled.

### Determination that permanent custody was in the best interest of the child

**{¶51}** In his third assignment of error, the father challenges the juvenile court's determination that granting permanent custody to CCDCFS is in the best interest of J.H. The father argues that a "legally secure placement" for J.H. "could have been found with [him]" because he had been employed at the same job for three years and had established a permanent residence with his mother, J.H.'s paternal grandmother, with whom J.H. had a good relationship. He further argues that because the agency was "focused on the mother" and was "ignoring the father," CCDCFS failed to "support its claim that the best interests of the child are served by severing all parental rights."

**{¶52}** In determining whether permanent custody is in the best interest of the child, the juvenile court consider must consider "all relevant factors," including, but not limited to, the following:

> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
>
> (b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
>
> (c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state;
>
> (d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;
>
> (e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

R.C. 2151.414(D)(1).

**{¶53}** The juvenile court has considerable discretion in weighing these factors. *See In re J.B.*, 2013-Ohio-1704, at ¶ 97 ("[T]he discretion that a trial court has in custody matters should be accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned."). The best interest determination focuses on the child, not the parent. *In re N.B.*,

2015-Ohio-314, at ¶ 59.   Although the juvenile court is required to consider each factor

listed in R.C. 2151.414(D)(1), no one factor is given greater weight than the others

pursuant to the statute.   *In re T.H.*, 8th Dist. Cuyahoga No. 100852, 2014-Ohio-2985, ¶

23, citing *In re Schaefer*, 111 Ohio St.3d 498, 2006-Ohio-5513, 857 N.E.2d 532, ¶ 56.

Further, only one of the enumerated factors needs to be resolved in favor of an award of

permanent custody.   *In re A.B.*, 8th Dist. Cuyahoga No. 99836, 2013-Ohio-3818, ¶ 17; *In*

*re N.B.* at ¶ 53.

{¶54} The juvenile court's September 21, 2016 journal entry reflects that it

considered all of the relevant factors under R.C. 2151.414(D)(1) in determining that an

award of permanent custody to the agency was in the best interest of J.H.    The juvenile

court explained its evaluation of these factors as follows:

> The Court finds the factors of (D)(1) weigh in favor of permanent custody.
> This child is living with the maternal grandmother who has both physical
> and temporary legal custody.   The maternal grandmother wants to adopt the
> child.    The paternal grandmother helps and supports the maternal
> grandmother on an informal basis.   This child is living with his siblings.
>
> The GAL for the child recommends permanent custody as being in the
> child's best interest.   The GAL was cross-examined and stated under oath
> that her recommendation is based on the length of time the child has been in
> custody.   The father knew how the mother was doing because he lived with
> her and his failure to pursue custody to himself eighteen months or two
> years after the removal is too late.   The best interest of the child must drive
> the case, not the case plan.   See 2151.414(C) which states that in making
> the determinations required by this section * * * a Court shall not consider
> the effect the granting of permanent custody would have on any parent of
> the child.

{¶55}   The record supports the juvenile court's findings.   As the testimony of the

social workers and GAL established, at the time of the hearing, J.H. was nearly two years

old.   Virtually his entire life had been spent in the care and custody of his maternal grandmother.   The award of permanent custody to the agency would allow the maternal grandmother to adopt J.H. and would allow him to stay in a familiar, stable, secure environment where he had been living as a family unit with his maternal grandmother and two of his adopted half-siblings, receiving appropriate care and thriving since shortly after his birth.

{¶56}   Although the father's counsel asserted at the hearing that the father had been living with his mother, J.H.'s paternal grandmother, for the last seven weeks, the father did not offer any evidence in support of that assertion at the hearing.   Nor did the father offer any evidence establishing that the paternal grandmother's residence was a place he and J.H. could reside permanently.   Further, although the social workers testified that the paternal grandmother had been a regular presence in J.H.'s life, assisting the maternal grandmother with babysitting and providing diapers and clothing for J.H., there was no evidence that she was willing to have J.H. reside with her on a permanent basis.   Solomon testified that when she attempted to reach out to the paternal grandmother, she was informed that the paternal grandmother did not want to get involved.

{¶57} Every parental rights termination case involves the difficult balance between maintaining a natural parent-child relationship and protecting the best interests of a child.  Although "[f]amily unity and blood relationship are vital factors to carefully and fully consider," we also recognize that the paramount consideration is always the best interest

of the child. *In re J.B.*, 2013-Ohio-1704, at ¶ 111. "[A] child's best interests require permanency and a safe and secure environment." *In re E.W.*, 8th Dist. Cuyahoga Nos. 100473 and 100474, 2014-Ohio-2534, ¶ 29.

{¶58} On the facts and evidence before us, we cannot say that the juvenile court erred in determining that an award of permanent custody to the agency was in J.H.'s best interest. There is sufficient competent, credible evidence in the record to support the juvenile court's determination. Accordingly, we overrule the father's third assignment of error.

**Reasonable efforts to reunify father and child**

{¶59} In his fourth assignment of error, the father challenges the juvenile court's finding that CCDCFS made reasonable efforts to reunify him with J.H. Citing R.C. 2151.414(E) and 2151.419, the father argues that the agency failed to provide "diligent case planning" to facilitate J.H.'s return to him and that the agency could have found a less restrictive placement for J.H. by amending the family's case plan and working with the father, verifying his employment, observing the father with J.H. and conducting a home visit.

{¶60} In *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816, the Ohio Supreme Court explained that even though R.C. 2151.419, "by its terms," does not apply to motions for permanent custody, the agency "must still make reasonable efforts to reunify the family during the child-custody proceedings prior to the termination of parental rights." *Id.* at ¶ 43; *see also In re J.H.*, 2017-Ohio-1564, at ¶ 21. "If the agency

has not established that reasonable efforts have been made prior to the hearing on a motion for permanent custody, then it must demonstrate such efforts at that time." *In re C.F.* at ¶ 43. Further, where, as here, the juvenile court relies on R.C. 2151.414(E)(1) to support an award of permanent custody to the agency, the court must examine the "reasonable case planning and diligent efforts by the agency to assist the parents" when considering whether the child cannot be placed with the parents within a reasonable time or should not be placed with the parents. *See id.*; R.C. 2151.414(E)(1).

{¶61} In this case, the record supports the juvenile court's determination that CCDCFS made reasonable efforts to reunify the family and engaged in "reasonable case planning" and "diligent efforts" to assist the parents in remedying the problems that caused J.H. to be taken from them. CCDCFS filed an initial case plan on September 30, 2014. It filed an amended case plan on January 20, 2015, after paternity had been established. Throughout the case, the juvenile court regularly reviewed the case planning services being offered by the agency and considered whether the agency was making reasonable efforts to reunify J.H. with his parents. At the September 2015 hearing on the motion for permanent custody, the magistrate made specific inquiries "about why the child's not with his father" given that he "had nothing else on his case plan he needs to do" and the juvenile court's journal entries dated October 20, 2015, March 4, 2016 and April 15, 2016, all include express determinations that the agency was making reasonable efforts to reunify J.H. with his parents, specifying exactly what was being done to achieve that goal. At no point did the father challenge these findings or object to the case plan or

the services the agency was offering him. Although, as discussed above, virtually all the agency's efforts initially focused on the mother, the record supports the conclusion that this was not unreasonable and was not attributable to a lack of "diligent case planning" given that the father had informed the agency that he did not want custody of J.H. separate and apart from the mother and it was the mother's substance abuse and mental health issues that precluded J.H. from being returned to his parents. The record reflects that when the father advised the agency that he changed his mind and wanted to pursue custody of his son, the agency took reasonable steps to further investigate the father's circumstances but that the father failed to cooperate with that investigation.

{¶62} The father's contention that CCDCFS failed to provide "diligent case planning" or otherwise failed to make reasonable efforts to reunify him with J.H. is without merit. The father's fourth assignment of error is overruled.

{¶63} Judgment affirmed.

It is ordered that appellee recover from appellant the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to the Cuyahoga County Court of Common Pleas, Juvenile Division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EILEEN A. GALLAGHER, PRESIDING JUDGE

MARY J. BOYLE, J., and
ANITA LASTER MAYS, J., CONCUR