[Cite as *In re M.W.*, 2024-Ohio-5328.]

# COURT OF APPEALS OF OHIO

# EIGHTH APPELLATE DISTRICT
# COUNTY OF CUYAHOGA

IN RE M.W., ET AL.                                :

Minor Children                                     :                     No. 113820

                                                              :

[Appeal by K.W., Mother]                   :

---

## JOURNAL ENTRY AND OPINION

**JUDGMENT:** REVERSED
**RELEASED AND JOURNALIZED:** November 7, 2024

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Juvenile Court Division
Case Nos. AD21901853 and AD22901116

---

### *Appearances:*

Michael Gordillo, *for appellant*.

Michael C. O'Malley, Cuyahoga County Prosecuting
Attorney, and Mohammed A. Misbah, Assistant
Prosecuting Attorney, *for appellee*.

EMANUELLA D. GROVES, J.:

{¶ 1} Appellant K.W., the mother of M.W. and J.W. ("Mother"), appeals the judgment of the Cuyahoga County Juvenile Court (the "juvenile court") terminating her parental rights to M.W. and awarding custody of him to the Cuyahoga County Division of Children and Family Services ("CCDCFS" or the "agency") and granting

legal custody of J.W. to his paternal grandmother, J.D. After a thorough review of the applicable law and facts, we reverse the judgment of the juvenile court.

**Factual and Procedural History**

{¶ 2} This matter commenced on March 5, 2021, when CCDCFS filed a complaint alleging that M.W. (d.o.b. 7-17-14), along with two siblings who are not parties to this appeal, was a neglected child because he had missed an excessive amount of school, was failing the 2020-2021 school year, and Mother lacked stable housing. At the time, Mother and her five children were residing in an extended stay hotel after an eviction. The complaint requested a disposition of temporary custody to the agency. At the time, Mother was pregnant with a sixth child. J.W. was not part of this complaint and was residing with his maternal grandmother, J.D.

{¶ 3} Following a hearing, the court denied the agency's motion for predispositional custody finding there was insufficient evidence that predispositional temporary custody was in the best interest of M.W. On April 23, 2021, CCDCFS filed a notice of amendment changing the dispositional request in its initial complaint from temporary custody to an order of protective supervision to CCDCFS. A case plan was developed to assist Mother in dealing with educational neglect and housing. A guardian ad litem was appointed for the children (the "GAL"). The GAL filed a report on April 23, 2021, recommending protective supervision to the agency as long as the court ordered the child to attend an extended school program to catch up on the work he had missed and additional tutoring.

{¶ 4} Mother subsequently stipulated to an amended complaint and agreed to the disposition of protective supervision to the agency. M.W. was adjudicated neglected, and Mother enrolled him in a catch-up program over the summer. A subsequent report indicated that although M.W. was enrolled in virtual school there was no progress on educational goals. Additionally, Mother had not obtained suitable housing. By October 21, 2021, the juvenile court issued a status report through a journal entry that M.W. was not attending school virtually and the family still resided in a hotel room. The agency filed an updated case plan shortly thereafter that added a requirement that Mother complete a mental health assessment to rule out any untreated mental health issue.

{¶ 5} On November 4, 2021, CCDCFS filed a motion to modify protective supervision to temporary custody to the agency. The primary allegation was that M.W. had missed an excessive amount of school and was failing the 2021-2022 school year. Additionally, the family continued to reside in an extended stay hotel. Simultaneously, CCDCFS filed a motion for interim temporary custody of M.W. The agency also filed a complaint regarding Mother's two remaining children, including J.W., alleging neglect and requesting predispositional temporary custody. J.W. had moved back with Mother by this time. The complaint alleged that J.W. had missed an excessive amount of school during the 2021-2022 school year and that Mother continued to reside in an extended stay hotel, which was not suitable to meet the children's basic needs. On November 19, 2021, the juvenile court granted the agency's motion for interim temporary custody of M.W., J.W., and their three

siblings. M.W. was placed in a foster home, while J.W. was placed with his paternal grandmother, J.D. The three remaining siblings were placed in a foster home together, separate from M.W.

**{¶ 6}** At the adjudication hearing on February 8, 2022, Mother stipulated to the complaint with regards to J.W. and agreed to a disposition of temporary custody for both J.W. and M.W. The updated case plan called for the children to attend school in person and improve academically and for Mother to obtain stable housing and address potentially untreated mental health issues. The agency's caseworker, Monica Siegers, testified that she provided Mother with a referral to Signature Health for a mental health assessment. February 8, 2022, Transcript p. 19. J.W.'s father, B.D., was to establish a relationship with his son and attend visitation with him. The case plan also called for Mother to address all of the children's mental health, because all five had been diagnosed with adjustment disorder since entering temporary custody.

**{¶ 7}** In April 2022, the agency reported that Mother had given birth and there were no safety concerns with regard to the infant. The GAL filed a report on April 25, 2022, which reported that Mother continued to reside in the hotel with the infant. He also noted that the other children were doing better in school and that Mother's "inability/unwillingness" to obtain housing prevented reunification.

**{¶ 8}** In August 2022, the juvenile court reviewed the disposition of the case, found that Mother had made some progress on the case plan, but significant progress was needed to alleviate the cause of removal of the children from the home.

At that time, Mother had obtained housing, but it had not been approved by the agency. The court also noted that Mother was attending visits and was appropriate during visitation. However, Mother refused to obtain a mental health assessment because she did not believe her mental health was an issue. In October 2022, the case plan was updated to include overnight visits with Mother, overnight visits with Father for J.W., Mother to increase her involvement in school activities, and reiterated the need for Mother to complete a mental health assessment.

{¶ 9} On November 2, 2022, Mother filed a motion for legal custody of all the children. In the motion, Mother alleged to have completed all case plan objectives, because she had obtained housing, completed a mental health evaluation through Signature Health, become actively involved in the children's education, and was capable of providing for their basic needs. CCDCFS filed a motion for first extension of temporary custody on November 30, 2022. The agency acknowledged that Mother had made some progress, but not sufficient to warrant returning the children to her home.

{¶ 10} On the same date, November 30, 2022, the GAL filed his report. He reported that he was unable to schedule a visit to Mother's new home. He called Mother's number and his number was "rejected." The agency's worker, per the GAL, also reported that Mother was refusing to allow the agency access to the home. Mother had obtained the mental health assessment from Signature Health but had refused to sign a release of information to the agency. He reported that Mother had also been late to or missed study sessions with the children. The GAL indicated that

overnight visits with Mother had begun and that J.W. and M.W. were displaying some negative behaviors. The GAL attributed this to reports from the children that Mother had told them of an upcoming hearing and allegedly told them they did not need to listen to their foster parents or school officials because they would be coming home. Nevertheless, the GAL reported that Mother had beds for the children but no bedding or linens and that she refused the agency's offer to provide them. Despite Mother's completion of the mental health assessment, the GAL recommended that Mother complete an evaluation with the Court's diagnostic clinic because she was displaying, in his opinion, poor decision making. Finally, given the foregoing, the GAL expressed concern for the infant in Mother's care and for her seventh child. The GAL reported that Mother was pregnant.

{¶ 11} On January 12, 2023, the juvenile court conducted a hearing on the motions and denied Mother's motion for legal custody and granted the agency's motion to extend temporary custody. Mother had informed the agency and the court that she was engaged, however, had not given the social worker her fiancé's name. At the hearing, Mother provided her fiancé's name and the juvenile court requested the agency conduct a background check. The court found that Mother had been inconsistent with attending study sessions at the library with the children but that she had completed the mental health assessment, which did not recommend treatment.

{¶ 12} On March 9 and 16, 2023, CCDCF filed a motion for second extension of temporary custody in each case. On March 17, 2023, the agency filed a semi-

annual review.  The agency reported that "Mother completed her own mental health services and was not recommended for services."  Referring to Mother's assessment at Signature Health as a "self-referral" the agency noted that Mother did not report to Signature Health any concerns with depression, anxiety, mania, separation anxiety, psychosis, social anxiety, phobias, attachment behaviors, panic attention, eating disorder, OCD, tics, or autism.  She did state she had been exposed to trauma and further assistance or screening for trauma was needed.  Signature Health found Mother did not "meet medical necessity for any recommended level of care."  Still, Mother was given a second referral for a mental health assessment to the diagnostic clinic but Mother failed to sign a release of information.  The agency further noted that Mother was "evasive, very confrontational and not willing to be reasoned with at times."

{¶ 13} The agency further noted that M.W. had become increasingly more erratic and was being assessed for an IEP.  There were no issues with behavior or aggression when he was initially placed.  J.W. was doing well in his paternal grandmother's home and doing well in academics, though his behavior was inconsistent.  Mother consistently visited with her three older children every Friday; however, she had missed visits with M.W. and J.W. in the last few weeks prior to the review.  M.W. exhibited anger and increasing negative behaviors as a result.  J.W. exhibited behaviors but those were balanced with his ability to visit with his father.  Mother had an additional visit at the library with both J.W. and M.W. on Mondays to assist in education.  Mother was consistently late or missed those visits.  There

was an incident between Mother and the paternal grandmother at one of those visits, after which the agency put those sessions on hold.

{¶ 14} The agency reported that Mother continued to reside in the same house, which she reported was owned by her fiancé. The home was suitable to meet the family's basic needs. Although her fiancé resided in the home with her, he was unwilling to make himself available to the agency for further investigation. It should be noted that, although Mother reported that her fiancé was the father of her two youngest children, he was not the father of any of the children in agency custody.[1]

{¶ 15} On May 24, 2023, the juvenile court held a hearing on the agency's motion for second extension of temporary custody. Mother and her fiancé appeared for the hearing. The agency's caseworker, Cynthia Malcolm ("Malcolm"), testified that the fiancé had previously provided his information but was unwilling to submit to fingerprinting. Malcolm was able to do a soft background check that revealed he had recently been terminated from probation and had a long history of involvement with drugs and guns. At that time, Mother was still residing in the same home with her fiancé; however, Mother had not allowed Malcolm to inspect the home since January. Per Malcolm, she often had difficulty reaching Mother via email or phone.

{¶ 16} Malcolm indicated that Mother consistently visited her three older children, but not J.W. and M.W. J.W.'s father B.D. would occasionally arrange visits with Mother. Mother had not visited M.W. Malcolm did arrange a phone call

---

[1] Paternity had been established for three of the children, including J.W. M.W.'s father was listed as John Doe.

between M.W., Mother, and his siblings in April, but there had been no face-to-face visitation. Prior to that, Malcolm testified it had been months since M.W. saw Mother. Mother had attended visits regularly until the agency changed the pickup point from the Warrensville Public Library to the Warrensville Police Department, against Mother's wishes. In fact, per Malcolm, Mother was "adamant" about not moving the pickup point to the police department. Malcolm then tried to reinstate the pickup at the library by asking J.W.'s father B.D. to facilitate pick up instead of the paternal grandmother; however, Mother was unwilling to agree to that arrangement. Malcolm reported that Mother did not want to talk to her, preferring to speak to her supervisor. In addition to Malcolm, the foster mother testified that the last visit M.W. had with Mother was on January 13, 2023. The juvenile court granted the agency's motion for second extension of temporary custody.

{¶ 17} On September 15, 2023, the agency filed a semiannual review. At that time, the agency reported that M.W. was doing well in school and there were no emotional or behavioral concerns. M.W. visited with J.W. but did not visit with Mother frequently. J.W. was also doing well in school and was also excelling in athletics. Mother was not consistent in visiting with J.W., though, she visited when he visited his father. The report listed the following major concerns: (a) the children's emotional behaviors; (b) the children's education; (c) mother's housing; and (d) mother's mental health. The agency noted that all of the children had made significant progress on their emotional behaviors and continued to receive services to assist them. All the children are enrolled in school, and Mother appeared willing

to follow through with meeting the children's academic and educational needs, as well as their behavioral, emotional, and mental health function needs. The agency found that Mother had maintained stable housing for over one year and that she had completed a mental health assessment, which did not recommend she receive treatment. The agency recommended reunification with Mother with a secondary option of adoption and/or legal custody.

{¶ 18} On October 2, 2023, CCDCFS filed a motion to modify temporary custody to legal custody to the paternal grandmother in J.W.'s case. On October 4, 2023, CCDCFS filed a motion to modify temporary custody to permanent custody to the agency for M.W. In an attached affidavit to the permanent custody motion, the worker assigned to the case, Jordyn Mikes ("Mikes"), averred that Mother had no contact with M.W. from January 13, 2023, to April 27, 2023, a period of greater than 90 days. Mother resumed contact in April 2023, but had failed to consistently support, visit, and/or communicate with him despite being given an opportunity to do so on a weekly basis.

{¶ 19} On December 4, 2023, the agency filed a notice of voluntary withdrawal of case plan amendment. In an earlier filing, the agency had removed the goal for Mother to obtain housing. In the notice, the agency alleged that Mother had not completed additional steps, including facilitation of monthly home visits and cooperation with the agency's investigation of fiancé.

{¶ 20} A hearing on the motions was held on January 19, 2024. Testimony revealed that the three oldest children had been returned to Mother's custody with

protective supervision. Additionally, the two youngest children remained in the home and the agency did not find grounds for removal. Nevertheless, the juvenile court granted the request for permanent custody of M.W. to CCDCFS and legal custody of J.W. to the paternal grandmother. Mother filed objections to the decision of the magistrate in both cases, which the juvenile court overruled. Mother now appeals, raising the following assignments of error for our review.

**Assignment of Error No. 1**

The trial court's decision to award legal custody of J.W. to his paternal grandmother over appellant was against the manifest weight of the evidence.

**Assignment of Error No. 2**

The trial court's decision to terminate appellant's parental rights with respect to M.W. and to award permanent custody of M.W. to CCDCFS was against the manifest weight of the evidence.

**Permanent Custody of M.W. to CCDCFS**

**Standard of Review**

{¶ 21} In each assignment of error, Mother has challenged whether the decision was supported by the manifest weight of the evidence. We will begin with M.W.'s permanent custody case.

{¶ 22} Preliminarily, it is well established that a parent has a fundamental right to raise and care for his or her child. *In re L.M.*, 2018-Ohio-963, at ¶ 16, citing *In re C.F.,* 2007-Ohio-1104, ¶ 28; *In re K.H.,* 2008-Ohio-4825, ¶ 40. "The right to parent one's children and maintain and pursue intimate familial associations are fundamental rights guaranteed by the Due Process Clause of the United States

Constitution." *In re J.W.*, 2007-Ohio-2007, ¶ 13 (10th Dist.). The termination of parental rights has been described as "the family law equivalent of the death penalty in a criminal case." *In re V.C.,* 2015-Ohio-4991, ¶ 35, citing *In re J.B.,* 2013-Ohio-1704, ¶ 66, quoting *In re Hoffman,* 2002-Ohio-5368, ¶ 14.

{¶ 23} "[T]he United States Supreme Court holds that before any court may completely and irrevocably sever a parent's rights in their natural child, 'due process requires that the State support its allegations by at least clear and convincing evidence." *In re J.W.*, ¶ 14, quoting *Santosky v. Kramer,* 455 U.S. 745, 747-748 (1982). R.C. 2151.414(B)(1) provides that a juvenile court may grant permanent custody to a children services agency if the court determines, "by clear and convincing evidence, that [the placement] is in the best interest of the child and that one of the five factors listed in R.C. 2151.414(B)(1)(a) through (3) applies." *In re Z.C.,* 2023-Ohio-4703, ¶ 7.

{¶ 24} "Clear and convincing evidence" is that measure or degree of proof that is more than a "preponderance of the evidence," but does not rise to the level of certainty required by the "beyond a reasonable doubt" standard in criminal cases. *In re K.S.,* 2021-Ohio-694, ¶ 15, citing *Lansdowne v. Beacon Journal Publishing Co.,* 32 Ohio St.3d 176, 180-181 (1987). It "produces in the mind of the trier of fact a firm belief or conviction as to the facts sought to be established." *Id.* "Where the proof required must be clear and convincing, a reviewing court will examine the record to determine whether the trier of facts had sufficient evidence before it to

satisfy the requisite degree of proof." *In re Z.C.* at ¶ 8, quoting *State v. Schiebel*, 55 Ohio St.3d 71, 74 (1990).

{¶ 25} The termination of parental rights is governed by R.C. 2151.41. *In re G.W.*, 2022-Ohio-2581, ¶ 32. Courts must apply a two-part test when deciding whether to award permanent custody to a children's services agency. *Id.*

**First Prong: R.C. 2151.414(B)(1)(a)-(e)**

{¶ 26} Under the first prong, the juvenile court needs to find that any of the following applies:

(a) The child is not abandoned or orphaned, has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period if, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.

(b) The child is abandoned.

(c) The child is orphaned, and there are no relatives of the child who are able to take permanent custody.

(d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state.

(e) The child or another child in the custody of the parent or parents from whose custody the child has been removed has been adjudicated an abused, neglected, or dependent child on three separate occasions by any court in this state or another state.

{¶ 27} In this matter, the juvenile court determined that the conditions set forth in R.C. 2151.414(B)(1)(b) and (d) applied. Only one of these must be present to satisfy the first prong of the permanent custody analysis. *In re G.W.*, 2022-Ohio-2581, ¶ 34. Here it is undisputed that M.W. entered the temporary custody of the agency on November 19, 2021. Per R.C. 2151.141(B)(1)(e), a child enters the temporary custody of the agency on the earlier of the date he is adjudicated or the date that is sixty days after the removal from the child's home. Sixty days later in this case was approximately January 18, 2022. At the time the agency filed its motion for permanent custody on October 4, 2023, M.W. had been in the temporary custody of the agency for a little over 20 months, for a consecutive period of time. As there was sufficient evidence to establish R.C. 2151.141(B)(1)(d), we need not consider whether the evidence supported a finding under R.C. 2151.414(B)(1)(b). The juvenile court's finding that the requirements R.C. 2151.141(B)(1)(d) were met were clearly and convincingly supported by the record.

## Second Prong:   R.C. 2151.414(D)

{¶ 28} The second prong requires the juvenile court to find that granting permanent custody to the agency is in the best interest of the child. Like the first prong, we review the juvenile court's best interest determination by determining whether it was supported by clear and convincing evidence. *In re Z.C.* at ¶ 11 and

R.C. 2151.414(B)(1). R.C. 2151.414(D)(1) sets forth the best interest factors that must be considered prior to granting permanent custody, including the following:

(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

{¶ 29} The bond between a child and his family is a key factor in the best interest of the child's determination. The agency had noted throughout the case that the boys were well bonded with Mother and their siblings. J.W. also got along well with his paternal grandmother and M.W. got along well with his foster mother. During an in camera interview with J.W. and M.W. before the hearing, both boys expressed a desire to be with Mother and their siblings. They had both met Mother's fiancé who they called "Rock" and spoke favorably about him. When asked where they would go if they could not return to Mother's care, both boys indicated they

would stay with their maternal aunt and J.W. referenced his grandfather in Florida. The court appointed an attorney to represent the children in addition to the GAL. The attorney informed the court that the children wished to return to Mother. The GAL recommended that the court grant the agency's motions.

{¶ 30} The juvenile court's journal entry noted it considered the relationship of the child to the Mother and to his siblings. Importantly, sibling bonds and maintaining sibling relationships cannot be understated. The American Bar Association's Litigation Section recent report, "Sibling Relationships are Sacred": Benefits of Sibling Placement and Contact, https://www.publiccounsel.net/wp-content/uploads/2023/06/ABA-Sibling-Toolkit-FINAL.pdf, (accessed Oct. 31, 2024) highlights recent social science research that the sibling bond may be just as important as the bond between parent and child. M.W. and J.W. were the only children in placements away from their siblings. Additionally, M.W. was the only child placed away from any family connection and not coincidentally the child who had the most extreme negative behaviors upon removal. The report notes that current research shows that failure to maintain sibling relationships in foster care can harm a child's "ability to form their identifies, deprives them of a vital source of support as they grow and develop, and cause lifelong grief and yearning." *Id.* During the in camera inspection, M.W. in particular lit up when asked about the prospect of seeing his siblings.

{¶ 31} In addition to the best interest factors, if a court determines at a hearing that by clear and convincing evidence any of the situations enumerated in

R.C. 2151.414(E) are proven, the "court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with the parent." When the court makes that finding, the court shall grant permanent custody to the agency. R.C. 2151.414(B)(2). In the instant case, the juvenile court found that R.C. 2151.414(E)(1) and (4) applied which hold:

> (1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.

> (4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child.

{¶ 32} Neither of these findings are clearly and convincingly supported by the record. The primary basis for removal of the children in 2021 was educational neglect and housing. For context, the agency became involved with the family in March 2021, during the height of the COVID-19 pandemic. Mother had lost her housing and was attempting to manage the educational needs of five children in a single hotel room while pregnant. She had concerns about allowing her children to go to school in person because of the pandemic and was utilizing distance learning. Finally, she had the added challenge that the hotel routinely removed residents from

the hotel wi-fi system every morning at checkout, i.e., 11:00 a.m. The children were removed from Mother's care when it was clear that the children were still not consistently logging into school, were failing to progress in school, and were at risk of or actually failing. M.W. was not promoted from first grade. Additionally, Mother remained in the hotel during this period. The agency made the decision to remove the children to address these issues. Subsequently, Mother's and the children's mental health was added.

{¶ 33} Although the juvenile court found Mother failed to progress and commit to M.W. and J.W., the agency moved for the three older children to be returned to Mother's care with protective supervision, the reunification occurring in December 2023. In the same month, the agency filed a notice of removal of a case plan amendment filed in August 2023 that found Mother had completed the housing requirement of the case plan. At the hearing for custody of M.W. and J.W., the caseworker testified that she did not have consistent access to Mother's home; however, when she inspected, she found that there were bedrooms for all of the children, including a shared bedroom for M.W. and J.W. Mother had obtained a mental health assessment and provided a release to the agency. The organization conducting the assessment did not make any recommendations for mental health treatment for Mother. Although Mother expressed some reluctance to providing mental health services for the children, agency witnesses admitted that the agency could monitor services through an order of protective supervision.

{¶ 34} With respect to visits, in the in camera interview, M.W. indicated he had not seen his mother in a year and a half. However, Mikes, who no longer worked for the agency at the time of the hearing, averred in her affidavit that visitation occurred between M.W. and Mother after April 2023. Furthermore, Mikes' supervisor, who was no longer assigned to the case, Tiffany Mahoney ("Mahoney") testified that all she knew for certain was that there had not been any visits after July 2023. Mahoney was not sure whether M.W. had communication with Mother outside of visits. Malcolm, who was reassigned to the case mere weeks before the hearing, was not aware of what visits had occurred. Finally, the record reflects that Mother visited consistently with both M.W. and J.W. until there was an altercation between Mother and the paternal grandmother at a visit. Although police were called and the paternal grandmother was identified as the primary aggressor, the agency unilaterally changed the visitation pick up to the local police department. It is unclear from the record how long the agency insisted on transfer at the police department before offering to reinstate the prior schedule. Nevertheless, Malcolm testified that Mother did participate in some school meetings regarding M.W.

{¶ 35} Although there was concern about Mother's fiancé and his criminal background, the agency placed Mother's oldest children back in the home. Furthermore, Malcolm testified that she did not observe anything in the home to warrant the removal of the two youngest children who were born after the agency became involved and there were no accusations of abuse or neglect. Mother complied with the requirements of her case plan, obtained stable housing, and

completed a mental health assessment. While the agency had concerns about Mother's follow through on educational goals, the primary factor leading to the removal, Mother's concerns about COVID-19 and her children's safety have been mostly ameliorated. Additionally, the agency is capable of monitoring Mother's conduct through an order of protective supervision.

{¶ 36} Based on the foregoing, the juvenile court's finding that permanent custody was in the best interest of M.W. was not clearly and convincingly supported by the greater weight of the evidence.

**Legal Custody of J.W. to Paternal Grandmother**

{¶ 37} Legal custody is statutory and governed by R.C. 2151.353. When a child has been adjudicated abused, neglected, or dependent, the juvenile court may grant legal custody to any person who files a motion or who is identified as a proposed legal custodian in a complaint or motion requesting legal custody of the child prior to the dispositional hearing. R.C. 2151.353(A)(3); *In re Ry.T.*, 2023-Ohio-12 ¶ 29 (8th Dist.). Additionally, the proposed legal custodian must sign a statement of understanding, which delineates their rights and responsibilities upon assuming legal custody. R.C. 2151.353(A)(3)(a)-(d).

**Standard of Review**

{¶ 38} The juvenile court also reviews whether legal custody of J.W. to his paternal grandmother is in the best interest of the child; however, it does so by determining whether the placement is proven by the preponderance of the evidence. Evidence is supported by the preponderance of the evidence when it is "'more

probable, more persuasive, or of greater value.'" *In re A.W.*, 2020-Ohio-3461, ¶ 22 (8th Dist.), quoting *In re D.P.*, 2005-Ohio-5097, ¶ 52 (10th Dist.). *See In re D.T.*, 2014-Ohio-4818, ¶ 17 (8th Dist.) (Where the legal custodian has complied with statutory requirements, the juvenile court need only determine whether legal custody is in the best interest of the child.). Mother has not challenged the statutory requirements.

{¶ 39} In the juvenile court's entry granting legal custody, the court noted that Mother failed to complete case plan goals as a barrier to reunification, specifically, failure to obtain a mental health assessment, and failure to allow the agency to inspect her current residence. However, as noted, these alleged failures did not prevent the agency from moving for the return of Mother's three oldest children to the home nor was there sufficient evidence to warrant removal of the two youngest children from the home. Further, the record reflects that Mother did complete a mental health assessment, which did not recommend treatment. The agency apparently disagreed with that assessment but did not present any evidence to explain that decision. The agency initially referred Mother to Signature Health, but it is unclear why, after Mother reluctantly obtained the assessment and provided a release of information, the agency insisted she complete another one.

{¶ 40} Both the agency workers and the paternal grandmother testified that J.W.'s father facilitated visitation between J.W. and Mother. None of the witnesses were clear on how many visits occurred. J.W. told the court he had seen Mother

about two weeks prior to the in camera hearing. Before that, the last visit was two to three months ago.

{¶ 41} As noted before, Mother consistently visited the child prior to the agency's decision to move the pickup location. The juvenile court also found that Mother failed to attend most of J.W.'s school events. In response to a question about whether Mother knew about J.W.'s sporting events, the paternal grandmother testified that J.W.'s sporting events were on the school's website and that Mother could have looked them up.

{¶ 42} J.W. is bonded with Mother and bonded with his siblings. Mother has stable housing and a room for J.W. Further, she has substantially complied with case plan objectives. Based on the foregoing, we find that the decision to grant legal custody to the paternal grandmother was not supported by the preponderance of the evidence.

{¶ 43} Judgment reversed.

It is ordered that appellant recover from appellee costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court, juvenile division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EMANUELLA D. GROVES, JUDGE

ANITA LASTER MAYS, J., CONCURS;
MICHELLE J. SHEEHAN, P.J., DISSENTS (WITH SEPARATE OPINION)


MICHELLE J. SHEEHAN, P.J., DISSENTING:

{¶ 44} Respectfully, I dissent. Appellant mother argues the juvenile court's decision awarding legal custody of J.W. to his paternal grandmother and awarding permanent custody of M.W. to CCDCFS was against the manifest weight of the evidence. As the Supreme Court of Ohio instructed in its recent decision in *In re Z.C.*, 2023-Ohio-4703, we play a deferential role in reviewing a manifest-weight challenge in a permanent custody case. Having reviewed the evidence and mindful of our limited role, I would affirm the trial court's judgment.

{¶ 45} When we review a manifest-weight challenge, we must "weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered." *Id.* at ¶ 14, quoting *Eastly v. Volkman*, 2012-Ohio-2179, ¶ 20. "'In weighing the evidence, the court of appeals must always be mindful of the presumption in favor of the finder of fact.'" *Id.*, quoting *Eastly* at ¶ 21. "'The underlying rationale of giving deference to the

findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony.'" *Id.*, quoting *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984). "'"If the evidence is susceptible of more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment."'" *Id.*, quoting *Seasons Coal Co., Inc.* at fn.3, quoting 5 Ohio Jur. 3d, Appellate Review, Section 603, at 191-192 (1978).

{¶ 46} In this case the juvenile court conducted more than ten hearings prior to the trial on the agency's motion for permanent custody. It also conducted incamera interviews of both M.W. and J.W. As the Supreme Court of Ohio observed, "[I]n proceedings involving the custody and welfare of children the power of the trial court to exercise discretion is peculiarly important. The knowledge obtained through contact with and observation of the parties and through independent investigation cannot be conveyed to a reviewing court by printed record." *Trickey v. Trickey*, 158 Ohio St. 9, 13 (1952).

{¶ 47} Mindful of our "deferential role in the manifest-weight analysis," *Z.C.* at ¶ 15, I will defer to the juvenile court's discretion in weighing the best-interest factors. The evidence in this case supports the GAL's opinion that M.W. and J.W. have been essentially abandoned by mother. Since the beginning of 2023, Mother had overnight visits consistently with her three older children, but she

deliberately excluded M.W. and J.W from these visits. J.W. was able to visit with mother only because his father helped facilitate the visits. In the GAL's recollection, M.W. has not seen his mother for two years. Mahoney, who received the case in July 2023, testified that, since July 2023, there was no contact between mother and M.W. The juvenile court has considerable discretion in weighing the best-interest factors. *In re J.H.*, 2017-Ohio-7070, ¶ 53 (8th Dist.). Here, the juvenile court's best-interest determination reflects that it placed significant weight on the interrelationship between the child and mother. "'The discretion that the juvenile court enjoys in determining whether an order of permanent custody is in the best interest of a child should be accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned.'" *In re Ch. O.*, 2005-Ohio-1013, ¶ 29 (8th Dist.), quoting *In re Awkal*, 95 Ohio App.3d 309, 316 (8th Dist. 1994). Having reviewed the evidence in the record and applying established legal precedent, I am unable to conclude the juvenile court "lost its way" in awarding permanent custody of M.W. to the agency.

{¶ 48} For similar reasons, I also disagree with the majority's reversal of the juvenile court's decision granting legal custody of J.W. to his paternal grandmother. Consequently, I dissent.