[Cite as *In re B.G.M.*, 2025-Ohio-1465.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

IN RE  B.G.M.                                    :

                                                           No. 114600

A Minor Child                                  :

[Appeal by C.M., Mother]                :

---

JOURNAL ENTRY AND OPINION

**JUDGMENT:**  AFFIRMED
**RELEASED AND JOURNALIZED:**  April 24, 2025

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Juvenile Division
Case No. AD-24-907761

---

*Appearances:*

Sylvester Summers, Jr., Co., L.P.A., and Sylvester
Summers, Jr., *for appellant*.

Michael C. O'Malley, Cuyahoga County Prosecuting
Attorney, and Joseph C. Young, Assistant Prosecuting
Attorney, *for appellee*.

MICHELLE J. SHEEHAN, P.J.:

{¶ 1} Appellant, C.M. ("Mother"), appeals from a judgment of the Cuyahoga County Juvenile Court granting permanent custody of her child, B.G.M. ("the child"), to the Cuyahoga County Division of Children and Family Services ("agency" or "CCDCFS").  Mother raises one assignment of error for our review:

The juvenile court erred in awarding permanent custody to the CCDCFS when it failed to show by clear and convincing evidence that adequate grounds existed for a grant of permanent custody and therefore such a decision was contrary to the manifest weight of the evidence.

{¶ 2} After review, we conclude that the juvenile court's judgment granting permanent custody to the agency was supported by clear and convincing evidence and is not against the manifest weight of the evidence. We therefore affirm the juvenile court's judgment.

## I. Procedural History and Factual Background

{¶ 3} The juvenile court originally granted CCDCFS emergency custody of the child in March 2024, after the child tested positive for cocaine at birth. But because of statutory time limits not being met, CCDCFS dismissed the original complaint and refiled it in July 2024, requesting a dispositional order of permanent custody in the refiled complaint. The child has remained in the temporary custody of the agency since March 2024.

{¶ 4} At an adjudicatory hearing in September 2024, Mother admitted to the following in the amended complaint: (1) the child had been in the uninterrupted custody of CCDCFS since March 2024, (2) Mother had issues with cocaine abuse, and the child tested positive for cocaine at birth, (3) Mother needed to complete a mental-health assessment and comply with recommendations, (4) Mother had six other children who had been removed from her care, and (5) Mother had been the victim of domestic violence by the child's alleged father. The juvenile court adjudicated the child to be an abused and dependent child.

**{¶ 5}** Just prior to the dispositional hearing, Mother moved for placement of the child with a paternal relative. The juvenile court held the dispositional hearing in late October 2024, where the following evidence was presented.

### A. Dispositional Hearing

### Case Manager

**{¶ 6}** Dennis Troup, a case manager at CCDCFS, testified that he had been involved with the family since November 2022. When CCDCFS first became involved with the family, Troup said that it was because of Mother's lack of stable housing, substance-abuse issues, and parenting concerns involving Mother's other children, who, at the time of the hearing, had not been returned to Mother's custody. Some of Mother's other children were still in the temporary custody of the agency, some were in a permanent planned living arrangement with the agency, and some had been emancipated. CCDCFS had moved for permanent custody of the children still in the agency's temporary custody.

**{¶ 7}** Regarding CCDCFS's housing concerns, Troup testified that Mother had lived in the same place for approximately one year, but he had never been able to verify if the home was appropriate for the child. Troup said that he went to see Mother's home in January 2024, but she only permitted him to stand in the entryway of the home and not go all the way inside. Troup stated that it did not appear as if Mother had "a lot of heat" in the home. Troup did not express this concern to Mother because "it was clear [he] wasn't welcome." Troup attempted to visit Mother's home after the child was born, but he "never got in."

{¶ 8} Regarding substance-abuse issues, Troup stated that Mother had not completed a program as required by her case plan. He said that he referred Mother to New Visions two times. Mother signed a release of information the first time, but her participation was "not good." After the second referral, Mother never started the program.

{¶ 9} Troup also referred Mother to a substance-abuse program at St. Vincent Charity Medical Center. Mother initially signed a release of information so that workers at St. Vincent could discuss Mother's progress with CCDCFS, but Mother later withdrew her consent. Prior to withdrawing her consent, Troup learned that Mother had been participating and had "some negative screens." Troup was not sure if Mother completed the program because he could no longer communicate with St. Vincent after Mother withdrew her consent.

{¶ 10} Mother found a substance-abuse program through Attain Behavioral Health and initially signed a release of information, but she revoked her consent before Troup could obtain any information. Troup later learned from Madison Fitch, Executive Director at Attain, that Mother had been terminated from the program sometime in the past couple of months before the hearing.

{¶ 11} Mother found another substance-abuse program at Northern Ohio Recovery Association ("NORA") that she wanted to attend. Mother informed Troup that she had signed a release, but when Troup called Mother's case manager, the case manager would not speak to Troup because she was on vacation. She told Troup to call the organization. Troup called the organization, but no one answered.

Troup said that he left a message, but no one returned his call, and therefore, Troup could not verify if Mother had signed a release. Troup did not know if Mother had participated in a program at NORA or whether she was still involved with a program there.

{¶ 12} Troup stated that Mother was also supposed to obtain a drug screen once per month. He said that she has "a lot more no shows than shows." He had last requested one about two months before the hearing, and Mother did not complete it.

{¶ 13} Regarding parenting issues, Troup said that Mother completed a parenting class in the summer of 2023. Despite completing the class, the agency still had concerns with Mother's parenting ability. Troup said that if Mother had remained in the program at New Visions, she could have completed another parenting class there.

{¶ 14} Troup testified that he supervises Mother's visits with the child. Mother had been "pretty good" at visiting the child since the child was born, although they had to change the visits to biweekly instead of weekly because Mother had missed several. In the three months prior to the hearing, however, Mother had been good about consistently visiting the child. Troup explained that sometimes Mother falls asleep while holding the child at the visits. At some visits, Mother is "really spot on" with the child.

{¶ 15} Troup testified that he also had concerns about domestic-violence issues between Mother and the child's alleged father. Troup said that the alleged

father had been convicted of domestic violence against Mother in 2023. When Troup observed father and Mother together, father was "aggressive" with Mother. Troup stated that father told him that he lived with or stayed with Mother. Troup testified that father also told him, "A lot of the times when I'm there, she'll tell me to say I'm not there[,] [b]ut that's where I stay most of the time. I'm with her all of the time." Troup testified that he had concerns about father living with or being around Mother because Mother admitted to Troup that father "is the one who influences her to use crack."

{¶ 16} Troup testified that he had concerns about the child being placed with the alleged father's aunt. Troup had spoken to the aunt on the phone and through email. Troup said that the paternal aunt refused to let the agency inside her home, so the agency could not approve her for placement. Troup agreed on cross-examination that it was his understanding that the paternal aunt was an approved foster parent through another agency that does not contract with CCDCFS.

{¶ 17} Troup further stated that one of the alleged father's other relatives cares for one of Mother's other children. But that relative told Troup that she did not want to care for "a baby," and thus, her home was not an option for placing the child in this case.

**Executive Director of Attain**

{¶ 18} Fitch testified that Mother was enrolled in Attain's housing program when Mother was involved with Attain in September 2024. Fitch said that while Mother was there, she received individual counseling and group therapy for

substance-abuse issues. However, Mother did not complete any of the programming. Ultimately, Mother "was administratively discharged after a long pattern of bad behavior and then refusal to go to a higher level of care recommended by clinical staff." Mother was only involved with Attain for approximately 18 days.

{¶ 19} Fitch agreed on cross-examination that Mother left Attain for seven days in the middle of the 18 days to attend a higher-level program at Square One in Ashtabula, but Fitch did not know anything else about what occurred at Square One in those seven days.

{¶ 20} Fitch also stated on cross-examination that she assisted Mother with visitations. The first time Fitch assisted Mother with visiting the child was in September 2024, and she said that Mother left the visitation and "got high." Fitch said this was "the first time [Mother] relapsed."

**Paternal Aunt**

{¶ 21} Mother presented the paternal aunt to testify. Paternal aunt stated that she had worked as an investigator for the government for 35 years. She lived by herself in a four-bedroom home in Cleveland. Paternal aunt stated that she has had a license "for foster care and adoption" for 25 to 30 years through Kids Count Too, which is a foster-to-adopt agency. She explained that "her last assignment" was in Wisconsin, where she fostered twins. Paternal aunt stated that Kids Count Too did not have a contract with the county, but they were trying to obtain one.

{¶ 22} Paternal aunt testified that she fostered four children in the past and adopted her friend's two children, who were seven and nine years old at the time

and are now adults. She said that she would like to foster the child as well as one of the other children who was currently placed at her sister's house and would be willing to adopt them if Mother and the alleged father could not regain custody.

{¶ 23} Paternal aunt testified that no one from CCDCFS has ever tried to come to her home. She said that if the director at Kids Count Too advised her that she needed to comply with letting CCDCFS into her home and fingerprinting her before she could obtain placement of the child, she would agree to it, but otherwise she would not agree to it "[b]ecause kinship is not a viable . . . option." She agreed on cross-examination that if she fostered the children through Kids Count Too, they would support her financially and otherwise. She said it was important for her to go through Kids Count Too "because kids need resources," such as shoes, clothes, and food.

**B. Guardian Ad Litem's Report and Testimony**

{¶ 24} The child's guardian ad litem recommended in her report that the court grant permanent custody of the child to the agency. She believed that it was in the child's best interest to do so.

{¶ 25} The guardian ad litem testified that she had been involved with Mother's case since 2021. She did not hear anything presented at the hearing that changed her recommendation regarding the child; she believed that it was in the child's best interest to be placed in the permanent custody of the agency.

{¶ 26} The guardian ad litem stated that Mother's other children are either in a PPLA of the agency, have emancipated, or are in the agency's temporary

custody. She said that CCDCFS filed for permanent custody of the two children who remain in its temporary custody.

{¶ 27} The guardian ad litem agreed that she had not tried to visit Mother's home in over one year. She said the last time she tried to do so, Mother told her that she would let her know when she was ready for the guardian ad litem to see her home. The guardian ad litem never talked to paternal aunt.

## C. Juvenile Court's Judgment

{¶ 28} The juvenile court found that Mother had not established a date for sobriety or maintained sobriety and that her chemical dependency is so severe that she is unable to provide an adequate, permanent home for the child at the present time or, as anticipated, within one year. The court found that Mother has placed the child at substantial risk of harm two or more times because of drug abuse and has rejected treatment two or more times. The court also found that Mother has committed abuse against the child and the seriousness of that abuse makes the child's placement with her a threat to the child's safety.

{¶ 29} The juvenile court found that despite CCDCFS's efforts, Mother had failed continuously and repeatedly to substantially remedy the conditions causing the child to be removed from the home. The court further found that the child cannot be placed with Mother within a reasonable time and should not be placed with Mother.

{¶ 30} The juvenile court stated that it considered Mother's request for placement of the child with paternal aunt. But the court found that paternal aunt

was not ready to foster the child because she needed additional time to discuss the matter with the director of Kids Count Too.

{¶ 31} The juvenile court considered the interaction and interrelationship of the child with the child's parents, siblings, relatives, and foster parents; the age of the child; the custodial history of the child; the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody; and the report of the guardian ad litem and found by clear and convincing evidence that a grant of permanent custody is in the best interest of the child.

{¶ 32} The juvenile court denied Mother's request to place the child with the paternal aunt and granted permanent custody of the child to the agency. It is from this judgment that Mother now appeals.

## II. Permanent Custody

### A. Statutory Requirements

{¶ 33} The right to raise one's own child is "'an essential and basic civil right.'" *In re N.B.*, 2015-Ohio-314, ¶ 67 (8th Dist.), quoting *In re Hayes*, 79 Ohio St.3d 46, 48 (1997). That right, however, is always subject to the ultimate welfare of the child. *In re B.C.*, 2014-Ohio-4558, ¶ 20, citing *In re Cunningham*, 59 Ohio St.2d 100, 106 (1979).

{¶ 34} An agency may obtain permanent custody of a child in one of two ways. *In re E.P.*, 2010-Ohio-2761, ¶ 22 (12th Dist.). An agency may first obtain temporary custody of the child and then file a motion for permanent custody under

R.C. 2151.413, or an agency may request permanent custody as part of its original abuse, neglect, or dependency complaint under R.C. 2151.353(A)(4).

{¶ 35} If the agency first obtains temporary custody of a child and later moves for permanent custody, generally, after the child has been in the temporary custody of the agency for 12 or more of a consecutive 22-month period pursuant to R.C. 2151.413(D), a juvenile court may award permanent custody to the agency if it finds by clear and convincing evidence that (1) any of the five factors under R.C. 2151.414(B)(1)(a) to (e)[1] exists, and (2) permanent custody is in the best interest of the child under the factors enumerated in R.C. 2151.414(D)(1).

{¶ 36} If the agency moves for permanent custody in its original neglect and dependency complaint pursuant to R.C. 2151.353(A)(4), which is what CCDCFS did in this case, the juvenile court may award permanent custody of an abused, neglected, or dependent child to the agency if the court (1) "determines in

---

[1] (a) [T]he child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents [in making this determination, the juvenile court must consider the factors set forth in R.C. 2151.414(E)].

(b) The child is abandoned.

(c) The child is orphaned, and there are no relatives of the child who are able to take permanent custody.

(d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period[.]

(e) The child or another child in the custody of the parent or parents from whose custody the child has been removed has been adjudicated an abused, neglected, or dependent child on three separate occasions by any court in this state or another state.

accordance with [R.C. 2151.414(E)] that the child cannot be placed with one of the child's parents within a reasonable time or should not be placed with either parent," and (2) "determines in accordance with [R.C. 2151.414(D)(1)] that the permanent commitment is in the best interest of the child."  R.C. 2151.353(A)(4).

{¶ 37} The best-interest prong, which juvenile courts must determine when an agency moves for permanent custody no matter when the agency does so, requires the court to determine, also by clear and convincing evidence, that granting permanent custody of the child to the agency is in the best interest of the child. R.C. 2151.414(D)(1) sets forth five factors that the court must consider when making the best-interest determination, including:

> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
>
> (b) The wishes of the child . . . ;
>
> (c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period . . . ;
>
> (d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;
>
> (e) Whether any of the factors in divisions (E)(7) to (11) apply in relation to the parents and child.

R.C. 2151.414(D)(1).

**B. Standard of Review**

{¶ 38} The standard for reviewing permanent custody cases was set forth in *In re Z.C.*, 2023-Ohio-4703. The Supreme Court of Ohio held that sufficiency of the evidence and/or manifest weight of the evidence — and not abuse of discretion — are the proper appellate standards of review of permanent custody determinations depending on the arguments raised on appeal. *Id.* at ¶ 11. Here, Mother argues that the juvenile court's decision granting CCDCFS's motion for permanent custody was against the manifest weight of the evidence.

{¶ 39} When reviewing for manifest weight, we "must weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new juvenile ordered." *Id.* at ¶ 14, citing *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 20. When weighing the evidence, we "'must always be mindful of the presumption in favor of the finder of fact.'" *Id.*, quoting *Eastley* at ¶ 21.

{¶ 40} When it comes to reviewing the best-interest factors, the juvenile court has considerable discretion in weighing them. *In re J.H.*, 2017-Ohio-7070, ¶ 53 (8th Dist.). "[T]he best-interest determination focuses on the child, not the parent." *In re N.B.*, 2015-Ohio-314, ¶ 59 (8th Dist.), citing *In the Matter of: Austin Mayle*, 2000 Ohio App. LEXIS 3379 (July 27, 2000 8th Dist.). Although the juvenile court is required to consider each factor listed in R.C. 2151.414(D)(1), no one factor

is given greater weight than the others pursuant to the statute. *In re T.H.*, 2014-Ohio-2985, ¶ 23 (8th Dist.), citing *In re Schaefer*, 2006-Ohio-5513.

## III. Analysis

{¶ 41} Mother asserts that CCDCFS moved for permanent custody under R.C. 2151.413 (obtained temporary custody first and later moved for permanent custody), but that is not the case. The agency moved for permanent custody from the outset in the refiled complaint pursuant to R.C. 2151.353(A)(4). Therefore, the juvenile court had to find, by clear and convincing evidence, that the child could not be placed with Mother within a reasonable time or should not be placed with Mother pursuant to R.C. 2151.414(E) and that permanent custody is in the child's best interest pursuant to R.C. 2151.414(D)(1).

### A. First Prong — R.C. 2151.414(E)

{¶ 42} When determining whether a child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents, a juvenile court must consider the factors outlined in R.C. 2151.414(E). *In re L.H.*, 2024-Ohio-2271, ¶ 34 (8th Dist.). "A juvenile court is only required to find that one of these factors is met in order to properly find that a child cannot or should not be placed with a parent." *In re Ky.D.*, 2024-Ohio-3198, ¶ 36 (8th Dist.), citing *In re Ca.T.*, 2020-Ohio-579, ¶ 27 (8th Dist.).

{¶ 43} After reviewing the juvenile court's findings in this case, we conclude that the juvenile court properly found that the child could not be placed with Mother

within a reasonable time under R.C. 2151.414(E)(1), (2), (4), (9), (14), and (15).

These provisions state:

> (1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.
>
> (2) Chronic mental illness, chronic emotional illness, intellectual disability, physical disability, or chemical dependency of the parent that is so severe that it makes the parent unable to provide an adequate permanent home for the child at the present time and, as anticipated, within one year after the court holds the hearing pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code;
>
> . . .
>
> (4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child;
>
> . . .
>
> (9) The parent has placed the child at substantial risk of harm two or more times due to alcohol or drug abuse and has rejected treatment two or more times or refused to participate in further treatment two or more times after a case plan issued pursuant to section 2151.412 of the Revised Code requiring treatment of the parent was journalized as part of a dispositional order issued with respect to the child or an order was issued by any other court requiring treatment of the parent.
>
> . . .

(14) The parent for any reason is unwilling to provide food, clothing, shelter, and other basic necessities for the child or to prevent the child from suffering physical, emotional, or sexual abuse or physical, emotional, or mental neglect.

(15) The parent has committed abuse as described in section 2151.031 of the Revised Code against the child or caused or allowed the child to suffer neglect as described in section 2151.03 of the Revised Code, and the court determines that the seriousness, nature, or likelihood of recurrence of the abuse or neglect makes the child's placement with the child's parent a threat to the child's safety.

{¶ 44} Mother argues that the record lacks competent, credible evidence to support the juvenile court's finding that the child should not or could not be returned to her within a reasonable time. She contends that she engaged in services after the case plan was implemented, but that she was not given a reasonable opportunity to complete the plan. Mother further argues that there is nothing in the record to indicate that she could not have remedied the conditions that led to the child's removal if she had just been given more time. She therefore maintains that she should have been given a six-month extension to reunify with the child. We disagree.

{¶ 45} CCDCFS presented evidence at the hearing that Mother had a long history of substance abuse and had lost custody of six of her other children, because — at least in part — of her substance-abuse issues. Further, although Mother began several substance-abuse programs, she failed to complete any of them. Not only had she failed to complete any of the programs, she either withdrew her consent so that her CCDCFS case worker could not speak with anyone at the program, did not give

her consent at all, or was removed from the program for bad behavior. Mother also continued to do drugs — even up to September 2024, the month before the permanent-custody hearing.

{¶ 46} Mother also refused to let her CCDCFS case worker into her home so that he could ensure that it was appropriate for the child. At one visit, when Mother let the case worker into the entryway of her home, her case worker testified that it did not appear as if Mother had heat in the home.

{¶ 47} The evidence also showed that, although Mother had completed a parenting class before the child was born, she still endangered the child by using cocaine during her pregnancy and the child tested positive for cocaine at birth. CCDCFS also presented evidence that Mother fell asleep while holding the child at some of the visits and left one visit to get "high."

{¶ 48} After review, we conclude that the juvenile court's findings under R.C. 2151.414(E) are supported by clear and convincing evidence. We further conclude, after weighing the evidence and considering the credibility of the witnesses, that the juvenile court did not clearly lose its way and create such a manifest miscarriage of justice that its judgment must be reversed.

{¶ 49} Furthermore, the juvenile court's findings under R.C. 2151.414(E) mandated the determination that the child could not or should not be returned to Mother within a reasonable time. *In re B.B.C.*, 2024-Ohio-588, ¶ 20 (8th Dist.) ("Pursuant to R.C. 2151.414(E), if the court determines, by clear and convincing evidence, that one or more of the (E)(1)-(16) factors exist, the court shall enter a

finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent."). We therefore find that the first prong of the permanent-custody analysis is supported by the manifest weight of the evidence.

**B. Second Prong — Best Interest of the Child**

{¶ 50} Having determined that the juvenile court's finding that the child could not or should not be returned to Mother within a reasonable time, we turn to the second prong of our analysis that requires the court to determine, by clear and convincing evidence, whether the order granting permanent custody of the child to the agency pursuant to R.C. 2151.414(D) is in the child's best interest.

{¶ 51} Mother argues that the juvenile court's finding that it was in the child's best interest to be placed in the permanent custody of the agency is not supported by clear and convincing evidence. Mother further argues that the juvenile court should have placed the child with paternal aunt. We disagree.

{¶ 52} The juvenile court in this case indicated that it considered the factors outlined in R.C. 2151.414(D)(1) and found that it was in the child's best interest to be placed in the permanent custody of the agency.

{¶ 53} Considering the first best-interest factor, the interaction and interrelationship of the child with the child's parents, siblings, relatives, foster parents, and out-of-home providers, and any other person who may significantly affect the child, the child was only seven months at the time of the hearing. However, the juvenile court heard evidence that the child's needs were being met in

the foster home. This factor does not weigh in favor of or against permanent custody.

{¶ 54} The second best-interest factor, the wishes of the child as expressed directly by the child or through the child's guardian ad litem, weighs in favor of permanent custody. The child's guardian ad litem testified that she believed it was in the child's best interest to be placed in the permanent custody of the agency.

{¶ 55} The third best-interest factor, the custodial history of the child, weighs in favor of permanent custody. Although the child was only seven months old at the time of the hearing, the child had been in the agency's temporary custody since birth.

{¶ 56} The fourth best-interest factor, the child's need for a legally secure placement and whether that type of placement can be achieved without a grant of permanent custody to the agency, weighs in favor of permanent custody. We have already determined that the juvenile court's finding that the child could not be placed with Mother within a reasonable time or should not be placed with Mother was supported by clear and convincing evidence. Therefore, the evidence supports the finding that the child could not obtain a legally secure placement without a grant of permanent custody to the agency.

{¶ 57} The fifth best-interest factor, whether any factors in R.C. 2151.414(E)(7) to (11) are applicable, weighs in favor of permanent custody to the agency. The juvenile court found that R.C. 2151.414(E)(9) applied. The court found that Mother has placed the child at substantial risk of harm two or more times because of drug abuse and has rejected treatment two or more times, and we have

already determined that this finding was supported by clear and convincing evidence.

{¶ 58} Mother concedes that the juvenile court "clearly considered all relevant" best-interest factors and recognizes "the heavy burden [she] must overcome" in asking this court to reverse the trial court's decision. But Mother contends that the juvenile court could have provided a legally secure placement of child by placing her with paternal aunt. At the permanent-custody hearing, however, Troup testified that paternal aunt refused to let CCDCFS workers into her home to verify if it was appropriate for the child to live there. Paternal aunt testified as well and admitted as much. The trial court considered Mother's request to place the child with paternal aunt and found that paternal aunt was not ready to care for the child because she needed additional time to consult with the director of Kids Count Too. After review, we cannot say that the juvenile court's decision denying Mother's request to place the child with paternal aunt was against the manifest weight of the evidence.

{¶ 59} Therefore, we conclude that the juvenile court's finding that it was in the child's best interest to be placed in the permanent custody of the agency is supported by clear and convincing evidence and is not against the manifest weight of the evidence.

{¶ 60} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court, juvenile division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MICHELLE J. SHEEHAN, PRESIDING JUDGE

EMANUELLA D. GROVES, J., and
DEENA R. CALABRESE, J., CONCUR